OPINION
{¶ 1} Appellant, Jennifer K. Sutton, appeals her convictions in the Jefferson County Court of Common Pleas on charges of conspiracy to commit murder, in violation of R.C. 2923.01(A)(1), a felony of the first degree, and complicity to commit felonious assault, in violation of R.C. 2923.03 and 2903.11, a felony of the second degree. Appellant contends that there was insufficient evidence to support the jury verdicts.
 {¶ 2} The victim in this case was Appellant's husband, William Sutton III. According to the testimony of James Kessler, who confessed to shooting the victim, Appellant asked Kessler to murder Sutton, and provided Sutton's whereabouts throughout the evening of September 23, 2006 and early morning of September 24, 2006 in order to allow Kessler to find Sutton and kill him. Appellant contends that Kessler acted on his own. Insofar as there was sufficient evidence adduced at trial to establish that Appellant solicited the attack on Sutton and facilitated its execution through a series of phone conversations with both men, Appellant's sole assignment of error is overruled and the judgment of the trial court is affirmed.
 Assignment of Error {¶ 3} "THE JURY VERDICT OF GUILT [sic] FOR CONSPIRACY TO COMMIT MURDER AND COMPLICITY TO COMMIT FELONIOUS ASSAULT WAS BASED UPON INSUFFICIENT EVIDENCE."
 {¶ 4} Appellant was convicted of conspiracy to commit murder in violation of R.C. 2923.01(A)(2), which required the state to prove the following elements: (1) Appellant purposefully promoted or facilitated the offense of murder; (2) Appellant *Page 2 
agreed with Kessler that she would engage in conduct that facilitated the murder; and (3) Appellant planned or aided in planning the commission of the murder. Appellant was also convicted of complicity to commit felonious assault in violation of R.C. 2923.03 and 2903.11, which required the state to prove that she knowingly aided and abetted Kessler in causing physical harm to Sutton.
 {¶ 5} Sufficiency is a term of art meaning that legal standard which is applied to determine whether a case may go to the jury or whether evidence is legally sufficient to support the jury verdict as a matter of law. Sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v.Robinson (1955), 162 Ohio St. 486, 124 N.E.2d 148. A conviction based on legally insufficient evidence constitutes a denial of due process.State v. Thompkins (1997), 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541, citing Tibbs v. Florida (1982), 457 U.S. 31, 102 S.Ct. 2211.
 {¶ 6} Where there is substantial evidence upon which the trier of fact has based its verdict, a reviewing court abuses its discretion in substituting its judgment for that of the jury as to the weight and sufficiency of the evidence. State v. Nicely (1988), 39 Ohio St.3d 147,529 N.E.2d 1236. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine.State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212. Therefore, an appellate court must view the evidence in a light most favorable to the prosecution, and determine whether any rational trier of fact could have found the essential elements *Page 3 
of the crime proven beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259, 547 N.E.2d 492; Jackson v. Virginia (1979),443 U.S. 307, 99 S.Ct. 2781.
 {¶ 7} In her brief, Appellant argues that the following evidence is undisputed: (1) James Kessler is the sole perpetrator behind the shooting and attempted murder of Sutton; (2) he admitted he had multiple confrontations with Sutton; (3) he admitted he was in love with Appellant even though she terminated their relationship in May of 2006; (4) the state dismissed one count of felonious assault against him and agreed to a joint recommendation of a four-year sentence; and (5) the state did not indict him on conspiracy to commit murder. Based upon the foregoing evidence, Appellant contends that there was insufficient evidence to support her convictions.
 {¶ 8} However, Appellant's summary of the evidence ignores several important facts established at trial. Appellant and Sutton both conceded that their marriage was volatile. (Trial Tr., pp. 274-275, 343-344.) According to Appellant, their relationship was occasionally violent, which she attributed to their drug use. (Trial Tr., p. 343.) Both admitted to extramarital affairs, including Appellant's affair with Kessler. (Trial Tr., pp. 343, 358.) Appellant and Sutton conceded that, on the night that he was shot, they had a heated argument at his residence in Adena, Ohio. Appellant slapped Sutton in the face and left the house. (Trial Tr., p. 335.)
 {¶ 9} Although Appellant ended her romantic relationship with Kessler, she and Kessler characterized themselves at trial as "best friends." (Trial Tr., pp. 240, 335.) *Page 4 
 {¶ 10} Appellant told the police that she had spoken to Kessler one time the night that Sutton was shot, (Trial Tr., p. 145), but phone records revealed that she called Kessler and Sutton, one after the other, numerous times that evening.
 {¶ 11} According to Kessler, Appellant called him at approximately 8:00 p.m. She told him that she had argued with Sutton and he threw her out of the house, and she wanted Kessler to hurt Sutton. (Trial Tr., p. 198.) They agreed that he would go to Sutton's house and talk with him. She called Kessler back at approximately 10:00 p.m. to determine why Kessler had not yet gone to Sutton's house, as Sutton was going out that evening and usually left the house at 10:00 p.m. (Trial Tr., p. 199.)
 {¶ 12} Sutton testified that he went to at least two bars in West Virginia that evening. (Trial Tr., p. 277.)
 {¶ 13} When Kessler arrived at Sutton's house, Sutton was not there, so Kessler decided to go home to St. Clairsville, Ohio. However, around midnight, Appellant told Kessler that since he was near Wheeling, West Virginia, he should look for Sutton at the Main Street Bar. (Trial Tr., p. 200.) Kessler testified that Appellant initially wanted him to "beat up" Sutton, but, by midnight, it became clear that she wanted him dead. When Kessler did not find Sutton at the Main Street Bar, Appellant sent Kessler to Baker's Bar on Wheeling Island. (Trial Tr., p. 202.)
 {¶ 14} Although Kessler saw Sutton's car at Baker's Bar, Sutton had already left that establishment by the time that Kessler doubled back. Kessler called Appellant and informed her that he had missed Sutton at Baker's Bar. (Trial Tr., p. 204.) During their next conversation, Appellant informed Kessler that Sutton had *Page 5 
been stopped at a sobriety checkpoint in Martins Ferry, after going in that direction to get something to eat. (Trial Tr., p. 205.)
 {¶ 15} Kessler returned to Sutton's house, but Sutton was not there. (Trial Tr., p. 205.) Kessler once again decided to go home, but he received another phone call from Appellant informing him that he should be passing Sutton on Route 250. (Trial Tr., p. 206.) When Kessler saw Sutton, he turned around and began to follow him. (Trial Tr., p. 207.) Sutton informed Appellant during one of their phone calls that evening that he was being followed and that he planned to pull his car over into a cemetery and confront the driver of the other car. However, Appellant convinced him to go straight home. Kessler followed Sutton into his driveway and shot him. (Trial Tr., p. 208.) The Sheriff of Jefferson County testified that the sheriffs office received a telephone call reporting the shooting at 2:58 a.m. (Trial Tr., pp. 301-302.) Approximately twenty minutes later, Kessler told Appellant that he shot Sutton. (Trial Tr., pp. 208-209.)
 {¶ 16} Appellant's cellular telephone records corroborate Kessler's version of the events leading to the attack on Sutton. A log of calls based upon the phone records of Appellant and Sutton for September 23 and 24, 2006 was compiled by Lieutenant John Parker, a detective with the Jefferson County Sheriffs Department, and admitted into evidence at trial. The following list of calls is taken from the log:

8:31 p.m. Kessler's cellular 1 minute
8:33 p.m. Kessler's cellular 30 minutes
10:25 p.m. Kessler's cellular 20 minutes
10:28 p.m. Incoming call 2 minutes
10:47 p.m. Bar in Wheeling W.V. 2 minutes
11:20 p.m. Sutton's cellular 1 minute
 *Page 6 
12:05 a.m. Kessler's cellular 1 minute
12:10 a.m. Kessler's cellular 1 minute
12:14 a.m. Sutton's cellular 2 minutes
12:15 a.m. Kessler's cellular 1 minute
12:31 a.m. Kessler's cellular 1 minute
12:53 a.m. Kessler's cellular 1 minute
1:13 a.m. Kessler's cellular 1 minute
1:14 a.m. Incoming call 8 minutes
1:22 a.m. Incoming call 1 minute
1:22 a.m. Called Voice Mail 1 minute
1:33 a.m. Kessler's cellular 1 minute
1:56 a.m. Kessler's cellular 1 minute
2:08 a.m. Kessler's cellular 1 minute
2:15 a.m. Kessler's cellular 4 minutes
2:26 a.m. Called Voice Mail 1 minute
2:27 a.m. Sutton's cellular 2 minutes
2:28 a.m. Sutton's cellular 1 minute
2:30 a.m. Sutton's cellular 4 minutes
2:35 a.m. Sutton's cellular 3 minutes
2:37 a.m. Kessler's cellular 2 minutes
2:39 a.m. Bar in Wheeling, W.V. 1 minute
2:47 a.m. Sutton's cellular 1 minutes
2:50 a.m. Called Voice Mail 1 minute
2:54 a.m. Sutton's cellular 2 minutes
3:01 a.m. Sutton's cellular 2 minutes
3:05 a.m. Sutton's cellular 1 minute
3:09 a.m. Sutton's cellular 1 minute
3:11 a.m. Kessler's cellular 1 minute
3:12 a.m. Kessler's cellular 1 minute
3:13 a.m. Adena, Ohio 1 minute
3:18 a.m. Adena, Ohio 1 minute
3:20 a.m. Sutton's cellular 1 minute
3:21 a.m. Kessler's cellular 4 minutes
3:26 a.m. Adena, Ohio 2 minutes
3:28 a.m. Sutton's cellular 2 minutes
3:30 a.m. Incoming call 2 minutes
3:32 a.m. Sutton's cellular 1 minutes
3:36 a.m. Kessler's cellular 1 minute

 {¶ 17} In an effort to call into question the reliability of the phone records, Appellant's counsel asked Parker to explain several one minute calls that Appellant *Page 7 
made to Sutton after he was shot. Parker explained that those calls likely rolled into Sutton's voice mail system. (Trial Tr., p. 188.)
 {¶ 18} Kessler testified that Appellant told him during their affair that she wished her husband dead. (Trial Tr., p. 210.) Kessler and Appellant had once discussed a plan to shoot Sutton in his driveway prior to the night that Kessler actually shot Sutton. Kessler further testified that Appellant told him to make an anonymous phone call to the police after the shooting and to implicate Sutton and his girlfriend in the crime. (Trial Tr., p. 212.) In the days following the shooting, Kessler met with Appellant or spoke on the phone with her every day. (Trial Tr., p. 215.)
 {¶ 19} Kessler's testimony was not the only incriminating evidence provided at the trial. Appellant gave conflicting accounts of her knowledge of the events that occurred on September 23 and 24, 2006. During a police interview on September 27, 2006, Appellant told the police that she did not know anyone who would want to kill her husband. (Trial Tr., p. 304.) Then, in her written statement dated October 10, 2006, she conceded that Kessler called her shortly after the shooting and told her that he shot Sutton. (Trial Tr., p. 165.) At trial, Appellant testified that the police coerced her written statement, and that she did not know that Kessler shot Sutton when she was first questioned by the police. (Trial Tr., p. 342.)
 {¶ 20} In addition to Appellant's contradictory statements regarding the night Sutton was shot, the state put on evidence that Kessler was not the first man that Appellant had solicited to kill her husband. Norman Glover testified that he engaged in an extramarital affair with Appellant, and that she repeatedly expressed the wish *Page 8 
that Sutton was out of her life permanently and that she wanted him "taken care of." (Trial Tr., pp. 252, 257.)
 {¶ 21} On one occasion, Appellant actually proposed a plan for killing Sutton: She told Glover to gather several of his friends so that they could "beat the crap" out of Sutton in his driveway and leave him there. (Trial Tr., p. 257.) Then one evening, Appellant told Glover that he should kill Sutton for her. (Trial Tr., p. 256.) Glover refused but encouraged Appellant to leave Sutton. He testified that Appellant abruptly ended the relationship after that evening. (Trial Tr., p. 258.) He claimed that he did not believe that Appellant was sincere about her intentions, until he found out that Sutton had been shot. (Trial Tr., pp. 256, 262.)
 {¶ 22} Appellant's text communications with Sutton that evening also gave rise to an inference that she was involved in the shooting. Although Appellant sent several text messages to Sutton throughout the evening, two text messages were eerily prophetic. Approximately 10 minutes before Kessler shot Sutton, Appellant sent him a text message that read: "If I die 2nite wil u miss me would u have regrets?" (Cellular Telephone Log, State's Exh. 2, p. 3.) Then, within moments of the attack on Sutton, Appellant sent him a text message that read, "R u ok. Got my feeling." (Cellular Telephone Log, State's Exh. 2, p. 3.)
 {¶ 23} As stated earlier, the weight to be given the foregoing evidence and the assessment of the credibility of the witnesses are reserved for the trier of fact. DeHass, supra. Viewing the foregoing evidence in a light most favorable to the prosecution, it is clear that a rational trier of fact could have found the essential *Page 9 
elements of the crimes of conspiracy to commit murder and complicity to commit felonious assault were proven beyond a reasonable doubt. SeeJenks, supra. Accordingly, Appellant's sole assignment of error is overruled and Appellant's conviction is affirmed.
Vukovich, P.J., concurs.
DeGenaro, J., concurs. *Page 1